And I think that we are ready to proceed. Thank you. May it please the Court, I'm Christopher Wright, representing the plaintiffs. In the last seven years, Cigna has provided almost no information to us about who's getting paid and what they're getting paid, and there are 20,000 plaintiffs in this class. Plaintiffs' counsel need an accounting and discovery to fulfill our duty to our clients, which we can't do if we don't know how much they're getting paid and who's not getting paid. In denying an accounting and post-judgment discovery, the district court applied the wrong standard of review. The district court repeatedly demanded proof of a violation of a court order. The standard is much more lenient than that. Will you say that she did not fail to apply the significant questions test, right, that she wanted proof of actual noncompliance? Yes, but. So that's the standard for post-judgment discovery, but there the district court forgot about the second part of the standard, which is that it considerably less than actual noncompliance is shown. So you have to show significant question, but it is considerably less than needed for noncompliance. And if you look in the opinion, which is, you know, in the special appendix, lost track of the second part of that standard and require proof of noncompliance at pages 14, 15, 16, and 17. Again, the standard is less than that. It's significant questions, and we have five reasons why that test is met. And, of course, if that test is met. Payments have been made over a period of years. And in actuarial terms, payments are going to be made over the next 20 or 30 years. Why do you have a right to an accounting periodically? So, Your Honor, we think we certainly have the right to know who's getting paid what. And if they're not getting paid what they were promised in these notices that went out in January of 2019, there has to be an explanation. Well, you say if they're not getting paid. Or if they're not getting paid what they were promised. And so that's actually the first reason why there are significant questions. Only in this litigation we've learned that Cigna does not think it promised to pay what it listed in the January 2019 notices. It now says that they're, quote, just estimates, unquote, which was news to us. And so especially if someone is not getting paid what they were told they would get paid, which happened to a number of the plaintiffs, like Dr. Kleiniger was the first one to complain, we're certainly entitled to know not only, you know, what they're actually getting and why Cigna thinks they shouldn't get what they were promised. And we think we should get discovery to look into that issue. But there are a number of plaintiffs who aren't getting paid what they were promised. And Cigna says, well, they're just estimates, and so you can't take discovery. And there could be many more plaintiffs who are not getting what they were promised, but they, you know, they haven't kept their January 2019 notice, and so they haven't complained yet to counsel. But that's, we need to know that information. In the Cafafi case from the D.C. Circuit where we sent you a Rule 28J letter, the court said that, you know, plaintiffs are always entitled to this kind of information. And, in fact, at the oral argument, Judge Pillard asked the defendant's counsel sort of, how can plaintiffs' counsel do their job if they don't even know who's getting paid what? So can you just, on the notice question, the January 2019 notices, can you help me understand what was inadequate about those notices? I mean, they give two figures, one Cigna's figure and one of the disputed figure that your side offered. And there are statements in the notice that say these figures could change for various reasons. If you commence a benefit at a different date, the amount of your benefit may be higher or lower. The resulting A and B benefit will be reduced by the value of retirement benefits you receive in the future from Cigna based on your Part B benefit. So what precisely did it need to say to be accurate? So it initially said that, you know, it's this number or that number. Let me just note that Judge Nagala seemed to think that that meant it couldn't be a number under Cigna's number. And we just think that that doesn't follow. The fact that it would be one or the other doesn't give Cigna opportunity to lower it more. Now, we don't really – so the 2019 notices said that it might change depending on the date that you retired. But it did not say that it would change based on the form of the benefit you take. So, you know, it gets a little complicated here that, of course, Cigna's position is that if you took an annuity, a Part B annuity, you get less under Part A than if you took a Part B lump sum. That was not on the notices. Cigna didn't add that until we thought the case was over. And, you know, in fact, we think there's a sort of an expressio unis sort of thing. If you get a notice that says it will depend on the year you retired, you would think, well, it won't depend on the form of the benefit that I elect. Well, it does on the first page say that the A of B benefit will be reduced by the value of retirement benefits you receive in the future based on your Part B benefit. So you knew that the value of your future benefit could be reduced. It doesn't say based on the form in which you take your Part B benefit, but could be reduced based on your Part B benefit. So I'm not sure what they changed the forms to say that at one point. Is that the January thing? I think this is from the January 2019 notice itself. Well, that's the one that warned about when you retired but not the form. And, you know, who would think that the form would actually make a difference? You sort of understand if you retire at 70, you should get more a month than if you retire at 65. But why would electing an annuity give you less than if you elect a lump sum? That just seems like a reason to give plaintiffs less. Do we have any idea how many people, maybe you don't, but how many people are affected by this notice problem? Well, we don't know, which is a reason we need an accounting. We are pretty sure that up to 3,800 might be affected. We know with the related small benefit cash out problem, up to 7,300 might be affected. So this isn't some tiny number. And I guess let me add that part of the reason we have significant questions about compliance is when this case was before the court last time, that's when we learned that Dr. Kleininger was not getting what he was promised. And Cigna wrote in their brief on page 17 that, quote, they talked about, quote, a single individual's unique circumstances that this court shouldn't pay any attention to. And, again, that's up to 3,800 people. We, you know, there are probably hundreds at least who really are affected. We don't know the answer. We plaintiff's counsel need to know that answer to fulfill our duties to our clients. I'd be happy to handle questions about the — Are people who are getting B annuities getting an annuity separate from their Part A annuity? Yes, Your Honor. They're two separate annuities. Yes. And there's a good reason for that? No, I'm just asking.  It's not — I'd enjoy telling you why there's a good reason for that. No, go ahead. Why is it that? Okay. So, lookit, the Part B — They aren't the same annuities, and they're not figured the same way. No. Okay. So that's because the benefits, and especially the Part B annuity benefit using for rate, is just a different thing than the Part A benefit. Yeah. The Part A benefit compensates the plaintiffs for Cigna's misrepresentations in the late 1990s. The Part B floor rates compensate plaintiffs for the fact that a decade later, when interest rates were low and their accounts were stagnating, Cigna felt that it needed to add an extra benefit to everybody in Part B. And it's important to understand that everybody who worked for Cigna got the benefit of the floor rates. It didn't matter whether they had been injured by the misrepresentations or even worked for Cigna when the misrepresentations were made. So these are apples and oranges, and so there's no sense to — It doesn't make sense for Cigna to be able to reduce the Part A annuity because they gave a little money in the Part B annuity. Our analogy is it's as if an employer was found guilty of paid discrimination on the basis of sex, and then 10 years later, everybody in the company got a bonus. You couldn't say, well, this person got a bonus, so we're going to reduce her relief for the paid discriminations. They're just different matters. Our clients are entitled to both their Part A annuities and their Part B annuities, and the floor rates, which Judge Arterton called artificial and said shouldn't apply to the annuities under Part A, which her exact words were not directly comparable. So Judge Arterton realized in 2017 that these annuities weren't directly comparable, and that's why, you know, entitled Part A and Part B, you know, unaffected, that Cigna shouldn't get an offset on account of that. Thank you, Your Honor. One question. Will the recipient, upon eventually receiving the payments, have the opportunity to protest that the payment was not consistent with what was earlier promised? I'm sorry, Your Honor. Will the recipient of the payments have the opportunity, upon receipt of the payments in the future, to protest that what was received was not consistent with what had been promised? Well, Your Honor, I'd sort of like to preserve that, but I don't understand how if they can't protest now, why should we wait until more people don't get what they were promised? You know, we've got a number of actual people here, like Dr. Kleininger, who I've mentioned, and Lisa Sabatella, who their January 2019 notices said one thing, and what they got was less. How much should the amounts vary for the two of them? I don't know that off of my head, but my recollection is that it's a couple hundred, and, you know, you multiply that by thousands of people, you're talking about an important amount of money. Thank you, Your Honor. Good afternoon, Your Honors. Thank you very much for your time. Since the inception of this case, plaintiffs have requested significant ongoing monitoring and compliance as well as an equitable accounting, and the district court consistently rejected that. Over the last decade, they've actually requested an equitable accounting at least six different times. The district court rejected it, including in 2019, and this court affirmed that decision. Just weeks after their petition for certiorari was denied, they resumed the litigation loop by filing again for another equitable accounting in the district court, and, again, they are simply trying to re-litigate remedy methodology questions that were already settled at this point a decade ago. The district court waded into these issues and, over the course of a several-hour hearing, took evidence, considered multiple sets of briefs, and ultimately wrote 30 pages of opinion as to why not only had plaintiffs failed to raise significant questions of noncompliance, but, in fact, Cigna was fully in compliance with its orders. Plaintiffs on appeal offer no reason to disturb these findings. They, number one, make a number of statements that can't be reconciled with the record, including outright misrepresentations, which I want to address here about the notices in particular, and they fail to come close to demonstrating that the district court abused its discretion or committed clearer in making its factual findings. The first thing I want to talk about is just very briefly the standard, what standard should apply, whether it's the significant question standard or whether there is some other standard derived from courts of equity that would be better applied here. My impression is both sides agree. Correct. Thank you. So then I will move on from that. All right. And so then the second thing I want to address is the questions around the content of the notices and whether or not Cigna was actually required to pay the amounts that were sent in the 2019 notices. Plaintiffs, in their reply brief and just now, said that they had no notice that Cigna assumed that those amounts that were included in the notices were simply estimates subject to change. In fact, if you look at JA-588, this is an e-mail that was attached to the status report that was filed with the district court in 2019 showing how Cigna was complying with the court's orders, so directly in front of the court before the previous accounting. This e-mail from Cigna to plaintiffs in question number six, which begins on 587 of the joint appendix, talks specifically about the nonpaid group, about 4,500 class members. And on page 588, Cigna wrote, as we have done consistently and disclosed to the court for its approval, we have used certain assumptions that are specified to calculate an estimate of these benefits and then end it. But as you know, this is simply an estimate, and the actual benefits will vary depending on each nonpaid class member's actual benefit commencement. And that is not the only time that we said that, although that was before the notices themselves went out. It's just to say that benefits will vary with the variances in the benefits. That's exactly right, which was actually — The fact is circular. In other words, the amount that someone receives who's not yet paid will depend on the actual facts and circumstances that apply when they elect their benefit. It could be their age. It could be the date. It could be the form of payment. And, in fact, in that same joint status report — Could it be how long they work? Excuse me? Could it be how long they were employed? Absolutely. How long they're employed, when they terminate, did they work past retirement age, or did they try to take their benefits early? All different factors that could impact it. And the fact that the form of benefits would actually impact it was specifically disclosed to the court in that status report. That was at JA 543, at paragraph 31. And also, in our opposition to their last motion to enforce and sanctions motion at JA 643 and JA 644, we specifically noted that the form of benefit is a factor that would impact the actual benefits paid to nonpaid class members. And then, as Your Honors pointed out, on the face of the notices themselves, it said things like, the amount of your benefits may be higher or lower than the amount that's included. And at JA 576, there's a notice that says, the amount of the annuity will be different if you are married, unless you waive the joint survivor annuity. This decision will be explained in a different communication, and it is those communications that they're now complaining about and which the court never ordered us to provide. And the court was mindful that it did not want to become a de facto plan administrator, as plaintiffs are trying to do now. I could go on with more examples. The district court, in its opinions denying their motion for an accounting, noted that the plaintiffs, or that the district court, had actually recognized in its 2018 attorney's fees decision that the amount of the benefits would be higher. It says the district court wrote, the value of remedy awards may be greater or lesser, depending on how class members choose to exercise their rights under the reform plan. That's docket 550 at 6 in the district court. The same opinion also mentioned that the use of assumptions was, quote, for the limited purpose of calculating attorney's fees, and it only ordered past due benefits. All of those are examples of where the district court actually affirmatively said, these are not actually the amounts that are being paid. And the plaintiffs themselves in JA 416 complained to the district court, quote, Cigna has stated that for these class members, its relief calculations are currently estimates that will be updated when the class member commences benefits. And so it's, I mean, I could go on, but I think you take my point that they knew that these were estimates just as the district court held. In terms of the use of the floor interest rate in the offsets, just very briefly. It didn't say that, though. The estimate said it will vary. And one of the things that was up on appeal in the last round here in front of Your Honors was the fact that other assumptions around the interest rates and the mortality tables would be determined as of the date of benefit commencement. And plaintiffs argued they should have been fixed at some date in the past. Cigna said, no, we're going to update them depending on when the person actually commences benefits. And the district court agreed with Cigna, and you all also agreed and affirmed. And so for that additional reason, the amount of benefit estimates are going to most definitely vary from what was in those notices, and the plaintiffs knew that. In terms of the floor interest rates, the reason this is even an issue, as I think that Your Honor understood, is because Part B actually includes very generous provisions to those who opt for annuities in which the value of their Part A benefit, which is included in their Part B payments, so it gets confusing, is increased when someone elects an annuity over a lump sum. And so consistent with Judge Kravitz's orders and Judge Arterton's 2012 opinion and then her 2016 opinion, further adopting and actually explicitly laying out the methodology that Cigna would use, Cigna has consistently taken the value of the amount paid to the participant regardless of whether it was in an annuity or a lump sum, converted it back to a lump sum, and then without use of the floor interest rate since the Court's, I think, 2017 decision, has then converted that to an annuity so that it's an apples-to-apples comparison of A plus B minus the amount already paid. And so the only place that the floor interest rate shows itself in that offset calculation is in the actual value actually paid to the participants. It is not used, as the district court properly found and is subject to a clear error standard of review, it is not used in the offset calculation. It's just that — It's used in the calculation of the Part B annuity, but not in the offset back to Cigna. Exactly right. And the reason that it is is because plaintiffs agree it's good for the participants to get that higher amount in Part B. And because the district court held that the portion of Part A that's captured in Part B should continue to be paid pursuant to the terms of Part B, the plaintiffs get that extra benefit on their Part A benefits when it's paid out as a part of the annuity. In terms of the number of people that this impacts, it's just several hundred, I think. I think when we think about what the district court held, 95 percent of people elected a lump sum. I actually think it might even be higher than that. And so the annuitants are very small. For the group of people who had elected an annuity before 2019, I don't think that group is in dispute. That group, we, Cigna, calculated the amount of the offset exactly the same way. That's at issue here. And consistent with that approach, uniform with that approach, we are now applying that same methodology as people opt for annuities. The reason that Dr. Kleinegger is a unique case in which we said earlier is because, number one, he's part of that very small minority that elected an annuity where the floor interest rate applied to his Part B benefit. But number two, and this is really why he's unique, it's because when he said, wait a second, this is lower than the amount you put in my notice, Cigna said to him, oh, that's because it was your form of notice. If you would prefer, you can instead elect a lump sum. You can change your election and take a lump sum rather than annuity. And Dr. Kleinegger declined because the value of the A plus B, even with that higher offset, was still greater when he took it as an annuity than it would have been had he instead opted for a lump sum. That's why he was unique. I know I'm right on time. Is there anything else this Court would like to hear about? Okay, thank you. We'll hear from Bob. Thank you, Your Honor. Just a couple of points. First, the reasons I gave you for there being significant questions about compliance, all five of them are things we learned after the last time we saw it in accounting. So denial of prior accountings is beside the point here. It's important to understand that in 2017, Judge Arterton rejected Cigna's attempted use of floor rates to increase the offset for the largest number of plaintiffs, those who chose lump sums under Part B. And she said that the reason for that was that they're artificial and that they're not directly comparable to the Part A benefits. And then she said in her later July 2017 order, and these rules apply, quote, uniformly across the entire class, unquote. So at that point, we reasonably believed that they simply couldn't use the floor interest rates as an offset for anybody. And we certainly believed that if they were going to do that, that under the CBS broadcasting decision, they had to go back to the district court and try to convince the district court that they were allowed to do that, even though there had been a ruling against using the floor rates and against using them, and that rule was uniform across class. We've cited CBS broadcasting at every level of this case, and we cited it yet again here, and you won't find a cite to CBS broadcasting in Cigna's brief, and you won't find an explanation for why they think they weren't required to go back to the district court and say, geez, we want to use floor rates for offsets in this other category. And they were required to do that. Didn't the plan provide that they could use floor rates? No. They had to use floor rates to increase the Part B annuities. That's in the plan. Wasn't there an addendum to the plan? I'm sorry? Wasn't there an addendum to the plan? An addendum? Yes. No. So the litigation determined the Amara benefit, and the Amara benefit, again, is a different thing for the violations and misrepresentations in the 1990s. And, you know, no, it didn't have in the plan that if we make a misrepresentation and a court orders us to do something, we're going to do it. But, of course, they're required to do it. But, again, I think the bigger point here is that Judge Arnerton said no use of floor rates for offsets. Well, your adversary is saying the floor rates are used in the calculation of the Part B annuity, not in the offsets, but they are part of the calculation of the annuity itself. Okay. So, Your Honor, this is frustrating because that's what they said at one point. What Judge Nagava basically said was, okay, you used the floor rates. They were incorporated into your offset, but it's okay. But now they're going back to saying they didn't use floor rates. There's no way you can look at these numbers and not conclude that the floor rates increase the amount of the offsets and, therefore, decrease the amount of the Part A benefit. Yeah, so it might be helpful to look at the joint appendix at page 848 to 850, where our expert, Mr. Holland, explains Dr. Kleiniger's ‑‑ Cigna was denying that they used floor rates. And he looked at it, and we had no information, but he reverse engineered it. He tried to ‑‑ you didn't get what you were promised in January 2019. You got this different number. And he figured out that the only way they got that number was from the use of floor rates. And that comes through in both of his declarations. And, as I say, Judge Nagata thought they were using floor rates. Again, she forgave them for that. And, you know, we think that part's wrong, but, you know, they were using floor rates. Thank you, Your Honor. Thank you both. And we'll take the matter under advisement.